IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:07-CT-3109-FL

| | | |
|---|---|---|
| JOHN FRANK WARREN, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| JOANNA WORLEY, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter comes before the court on the motion to dismiss (DE # 14) pursuant to Federal

Rule of Civil Procedure 12(b)(6) of defendant Hope Harrison (hereinafter "defendant Harrison").

Also before the court are the motion for summary judgment (DE # 35) pursuant to Rule 56 of

defendant Joanna Worley (hereinafter "defendant Worley") and the motion for summary judgment

(DE # 34) of defendant James Turpin (hereinafter "defendant Turpin") and defendant Peter Keyser

(hereinafter "defendant Keyser"). These matters are ripe for adjudication. For the following

reasons, the court rules upon defendants' motions as follows.

STATEMENT OF THE CASE

On August 23, 2007, plaintiff, a state inmate, filed this *pro se* complaint pursuant to 42

U.S.C. § 1983 against defendants Worley, Turpin, Harrison, and Keyser. In his complaint, plaintiff

alleged that defendants were deliberately indifferent to his medical needs in violation of the Eighth

Amendment of the United States Constitution. On December 14, 2007, defendant Harrison filed a

motion to dismiss, arguing that plaintiff's claims against her should be dismissed for failure to

exhaust his administrative remedies. On February 6, 2008, plaintiff filed a pleading captioned "Plaintiff's Submission of Evidence." Also on this date, plaintiff filed a response to defendant Harrison's motion to dismiss and a response to defendant Harrison's answer to plaintiff's complaint. On February 18, 2008, defendant Harrison filed a reply to plaintiff's response to her answer. On the same date, plaintiff filed a sur-reply and a reply to defendant Harrison's response to plaintiff's submission of evidence. On March 28, 2008, plaintiff filed a pleading captioned "Motion of Submission of Evidence." Defendant Harrison responded to plaintiff's motion on March 31, 2008.

On May 19, 2008, defendants Turpin and Keyser filed a motion for summary judgment, arguing that plaintiff's claims are without merit. Defendant Worley also filed a motion for summary judgment on this date, arguing that plaintiff's claims are without merit. On May 28, 2008, plaintiff filed a motion requesting an extension of time to respond to the motions for summary judgment. Plaintiff's motion was granted on June 3, 2008. On June 18, 2008, plaintiff filed a response to defendant Worley's motion for summary judgment. Then, on July 16, 2008, plaintiff filed a response to the motion for summary judgment filed by defendants Turpin and Keyser. Also, on July 16, 2008, plaintiff filed responses to the affidavits filed in support of the motion for summary judgment of defendants Turpin and Keyser. Defendant Harrison then filed a response to plaintiff's response to the affidavits of defendants Turpin and Keyser. Finally, plaintiff filed a response to defendant Harrison's motion.

## STATEMENT OF THE FACTS

The undisputed facts are as follows. Defendant Turpin began treating plaintiff at Craggy Correctional Center (hereinafter "CCC") in June 2003. (Def.s' Mem. Turpin Aff. ¶ 5 and Ex. A.) On June 10, 2003, Licensed Practical Nurse Davis saw plaintiff in the medical clinic at CCC after

2

plaintiff complained of left hip pain, which he stated prevented him from sleeping through the night. (Id. Turpin Aff. ¶ 8 and Ex. B.) Plaintiff requested an extra mattress or egg crate. (Id.) Nurse Davis noted no restriction with plaintiff's ambulation and also noted that he moved fluidly. (Id.) Nurse Davis, with the approval of defendant Turpin, ordered an x-ray of plaintiff's left hip. (Id.) Plaintiff's x-ray results were negative. (Id.) The radiological report noted that there was no evidence of fracture or any significant degenerative joint disease. (Id. Turpin Aff. ¶ 9 and Ex. B.)

On June 20, 2003, Family Nurse Practitioner Morgan reviewed plaintiff's medical records and noted that, because plaintiff's x-ray results were negative, there was no need for an extra mattress. (Id. Turpin Aff. ¶ 9 and Ex. B.) Defendant Turpin reviewed Nurse Morgan's note in plaintiff's medical records, agreed with her assessment, and co-signed her note. (Id) Defendant Turpin also reviewed plaintiff's x-ray report. (Id.)

On June 29, 2003, plaintiff submitted a sick call request complaining that he was experiencing increased hip pain and that he was not able to sleep at night. (Id. Turpin Aff. ¶ 10 and Ex. B.) Plaintiff requested that a magnetic resonance imaging (hereinafter "MRI") test be ordered. (Id.) Defendant Worley saw plaintiff in the medical clinic the next day and noted that plaintiff had good movement in his hips. (Id.) Defendant Worley, with the approval of defendant Turpin ordered a lumbar spine x-ray and also ordered that plaintiff receive an extra pillow for proper alignment of his hips and spine. (Id.) Additionally, defendant Worley recommended that plaintiff exercise his abdominal muscles. (Id.) The results of plaintiff's lumbar spine x-ray showed a mild L3 compression. (Id. Turpin Aff. ¶ 11 and Ex. B.) Defendant Turpin then ordered a repeat lumbar spine x-ray. (Id.)

3

On July 14, 2003, plaintiff made a sick call request again asking for a MRI of his hips. (Id. Turpin Aff. ¶ 12 and Ex. C.) Registered Nurse Parker examined plaintiff and recommended an x-ray of his right hip. (Id.) Defendant Turpin approved Nurse Parker's x-ray recommendation so that he could rule out degenerative disease. (Id.) The results of plaintiff's right hip x-ray revealed mild degenerative change with no acute fracture. (Id.) The results of plaintiff's second lumbar spine x-ray revealed mild lumbar scoliosis, compression of the superior end plate of L3, and no bone destruction. (Id.)

On July 28, 2003, defendant Turpin conducted a follow-up examination with plaintiff to review the results of plaintiff's x-rays. (Id. Turpin Aff. ¶ 13 and Ex. C.) Defendant Turpin explained to plaintiff that he likely had arthritis in his right hip and an old mild compression of L3. (Id.) Defendant Turpin also explained that there was no need for surgical intervention or referral to a specialist. (Id.) Defendant Turpin noted that plaintiff weighed two hundred twenty-nine (229) pounds and encouraged plaintiff to achieve a goal weight of two hundred ten (210) pounds. (Id.) Defendant Turpin also prescribed an egg crate mattress for one year and encouraged walking. (Id.) Finally, defendant Turpin prescribed a six-week follow-up appointment and Voltaren (a non-steroid anti-inflammatory). (Id.)

Plaintiff had his six-week follow-up appointment with defendant Turpin on September 8, 2003. (Id. Turpin Aff. ¶ 14 and Ex. C.) Plaintiff's weight was at two hundred thirty-two (232) pounds. (Id.) Defendant Turpin noted that plaintiff reported some benefit with Voltaren. (Id.) Defendant Turpin then renewed plaintiff's prescription for Voltaren and also prescribed the pain reliever Percogesic. (Id.)

4

On October 28, 2003, plaintiff submitted a sick call request, complaining of bi-lateral hip pain. (Id. Turpin Aff. ¶ 16 and Ex. E.) Plaintiff was seen by Licensed Practical Nurse S. Killey, who noted that plaintiff ambulated without difficulty and that he had no difficulty getting on and off the exam table. (Id.) Plaintiff told Nurse Killey that his medications Percogesic and Voltaren were helping, but that they were not helping enough. (Id.) Nurse Killey noted that plaintiff had a four pound weight loss. (Id.) Defendant Turpin reviewed plaintiff's chart on November 10, 2003, and proceeded with his plan to continue plaintiff's medications. (Id.)

Plaintiff submitted a sick call request on November 26, 2003, requesting that his medications be updated. (Id. Turpin Aff. ¶ 17 and Ex. F.) Plaintiff again was seen by Nurse Killey, who noted that plaintiff had no difficulty ambulating. (Id.) Defendant Turpin then reviewed plaintiff's medical records on December 8, 2003, and renewed plaintiff's prescriptions for Voltaren and Percogesic. (Id.)

On January 5, 2004, defendant Turpin examined plaintiff in the medical clinic, following plaintiff's request for a bottom bunk. (Id. Turpin Aff. ¶ 18 and Ex. F.) Defendant Turpin increased plaintiff's Percogesic prescription and renewed plaintiff's medical slip for a bottom bunk. (Id.)

On February 12, 2004, Nurse Parker examined plaintiff in the medical clinic following a sick call request in which plaintiff requested a PULHEAT health restriction update.[1] (Id. Turpin Aff. ¶ 19 and Ex. F.) Nurse Parker noted plaintiff was not in obvious distress. (Id.) Nurse Parker also ordered, with the approval of defendant Turpin, a laboratory work up which included a complete metabolic panel, a complete blood count, a urinalysis, a lipid panel, and a physical examination to determine plaintiff's activity restrictions. (Id.)

---

[1] A PULHEAT is a North Carolina Department of Correction form on which a patient's activity restrictions are noted. (Id. Turpin Aff. ¶ 19.)

On March 5, 2004, plaintiff had his physical examination with Nurse Morgan. (Id. Turpin Aff. ¶ 22 and Ex. H.) During his appointment, plaintiff described the limitations of his lumbar spine, hips, and ankles. (Id.) He stated that he was unable to walk around the track due to his left hip pain. (Id.) Nurse Morgan noted that plaintiff's physical examination was unremarkable, except for limitations in range of motion of his back, ankle, and his right lower extremity. (Id.) Nurse Morgan discussed with plaintiff the need for a lifestyle modification including exercise, a change in diet, smoking cessation, and weight loss. (Id.) Nurse Morgan noted that plaintiff was not receptive to a change in his diet. (Id.) Finally, Nurse Morgan prescribed Fish Oil tablets and updated plaintiff's PULHEAT activity restrictions. (Id.) Defendant Turpin reviewed plaintiff's medical records and approved Nurse Morgan's recommendations. (Id.)

On June 8, 2004, plaintiff submitted a sick call request in which he requested refills for his pain medications. (Id. Turpin Aff. ¶ 27 and Ex. K.) Nurse Killey saw plaintiff in the medical clinic on June 10, 2004, and documented that the Voltaren and Percogesic were effective for plaintiff's hip pain. (Id.) Defendant Turpin reviewed plaintiff's chart and renewed his medications. (Id.) On June 21, 2004, defendant Turpin renewed plaintiff's egg crate mattress for one year. (Id. Turpin Aff. ¶ 28 and Ex. K.)

On October 13, 2004, plaintiff requested that his Percogesic be increased to assist with his hip pain. (Id. Turpin Aff. ¶ 30 and Ex. L.) Plaintiff was seen by Nurse Killey, who noted that plaintiff ambulated and got on and off of the exam table without difficulty. (Id.) Defendant Turpin reviewed plaintiff's chart and increased his Percogesic prescription. (Id.)

Plaintiff again visited the medical clinic on December 21, 2004, complaining that the Percogesic was not controlling his hip pain. (Id. Turpin Aff. ¶ 31 and Ex. L.) Nurse Killey

examined plaintiff, and Nurse Morgan reviewed plaintiff's medical records. (Id.) With the approval of defendant Turpin, Nurse Morgan prescribed plaintiff Indocin (a non-steroid anti-inflammatory drug) and discontinued plaintiff's Voltaren. (Id.)

On February 16, 2005 and February 23, 2005, plaintiff submitted sick call requests complaining of hip pain. (Id. Turpin Aff. ¶ 32 and Ex. M.) Plaintiff also requested an MRI, surgery to replace his right hip, and an update of his health restrictions. (Id.) Defendant Turpin saw plaintiff on February 28, 2005. (Id.) Defendant Turpin documented that plaintiff had "early, mild degenerative changes" of his right hip and that he had "mild lumbar scoliosis and a questionable compression fracture at L3." (Id.) Defendant Turpin also noted that plaintiff's hip pain was not helped with non-steroid anti-inflammatory drugs. (Id.) Defendant Turpin updated plaintiff's PULHEAT form. (Id.) Defendant Turpin ordered x-rays of plaintiff's right and left hips and his lumbar spine. (Id.) He ordered that plaintiff have a bottom bunk, that plaintiff's mattress be replaced in one year, and that plaintiff have a follow-up appointment subsequent to the completion of his x-rays. (Id.) Finally, defendant Turpin discontinued plaintiff's Indocin prescription and renewed his Percogesic prescription. (Id.)

Plaintiff had his follow-up appointment with defendant Turpin on March 21, 2005. (Id. Turpin Aff. ¶ 33 and Ex. N.) Plaintiff's right and left hip x-ray results showed normal hips with no fractures, dislocation, or degenerative changes. (Id.) The lumbar spine x-ray results showed a twenty-five percent (25%) age indeterminate compression deformity at L3 with no loss of alignment. (Id.) Defendant Turpin noted that plaintiff expressed that he was distressed and discouraged, feeling that "nothing is being done." (Id.) Defendant Turpin prescribed several laboratory tests to determine whether there was an alternative etiology for plaintiff's pain complaints. (Id.) The tests

7

defendant Turpin prescribed included: (1) a fluorescent anti-nuclear antibody test; (2) a sedimentation rate test; (3) a uric acid test; and (4) a rheumatoid arthritis test. (Id.) Finally, defendant Turpin prescribed plaintiff the anti-inflammatory drug Naprosyn. (Id.) The results of plaintiff's laboratory tests were normal. (Id. Turpin Aff. ¶ 34 and Ex. N.) Defendant Turpin renewed plaintiff's Percogesic on April 13, 2005. (Id. Turpin Aff. ¶ 35 and Ex. N.)

Plaintiff submitted a sick call request on May 4, 2005, complaining of continued hip pain and the inability to sleep at night. (Id. Turpin Aff. ¶ 36 and Ex. O.) Nurse Killey saw plaintiff and noted that he ambulated without visible difficulty and that he was able to get on and off the exam table without difficulty. (Id.) Nurse Warren reviewed plaintiff's medical records and, with the approval of defendant Turpin, scheduled an appointment for defendant Turpin to see plaintiff. (Id.)

On May 27, 2005, defendant Turpin examined plaintiff, who complained of continued pain. (Id. Turpin Aff. ¶ 37 and Ex. O.) Defendant Turpin ordered x-rays of plaintiff's right hip to determine if there had been any further degenerative changes. (Id.) Defendant Turpin also ordered plaintiff a second regular mattress and discontinued plaintiff's Naprosyn prescription. (Id.) Plaintiff's right hip x-ray results showed that plaintiff's right hip was symmetrical and intact without evidence of fracture, dislocation, or other significant bony abnormalities. (Id. Turpin Aff. ¶ 38 and Ex. P.) Also, no degenerative changes were noted. (Id.)

Plaintiff was seen on July 12, 2005 for his complaints of hip pain. (Id. Turpin Aff. ¶ 39 and Ex. Q.) On September 14, 2005, Nurse Morgan, with the approval of defendant Turpin, renewed plaintiff's prescription for Percogesic. (Id. Turpin Aff. ¶ 40 and Ex. Q.) Next, on October 14, 2005, defendant Turpin reviewed plaintiff's medical records, scheduled him for a twenty (20) minute back work-up, and renewed his Naprosyn prescription. (Id. Turpin Aff. ¶ 41 and Ex. Q.) Finally,

defendant Turpin ordered plaintiff an extra blanket for six months to assist with his comfort. (Id.)

On October 31, 2005, plaintiff saw defendant Turpin and received his back work up. (Id. Turpin Aff. ¶ 42 and Ex. R.) Defendant Turpin noted that plaintiff moved easily on and off the table and that he dressed comfortably. (Id.) Defendant Turpin also noted that plaintiff's range of motion was one hundred percent (100%), his heel to toe walk was normal, he had no motor sensory aberration, his tendon reflexes were 2+ equal, and his straight leg raises were normal. (Id.) Defendant Turpin prescribed plaintiff a foam cushion and Darvocet-N (an analgesic). (Id.) On November 9, 2005, defendant Turpin approved a prescription for plaintiff to have an extra pillow and also approved the discontinuation of plaintiff's Darvocet-N prescription.[2] (Id. Turpin Aff. ¶ 43 and Ex. R.) Finally, on December 7, 2005, defendant Turpin increased plaintiff's Percogesic after complaints of hip pain. (Id. Turpin Aff. ¶ 44 and Ex. S.)

On December 8, 2005, plaintiff was transferred from CCC to Harnett Correctional Institution (hereinafter "HCI"). (Id. Keyser Aff. ¶ 6.) While he was at HCI, plaintiff was treated by defendant Keyser.[3] (Id.) On January 4, 2005, Physician Assistant King examined plaintiff, subsequent to plaintiff's complaints of hip, back, and ankle pain. (Id. Keyser Aff. ¶ 8 and Ex. B.) Physician Assistant King diagnosed plaintiff with degenerative joint disease of the lower back and hip secondary to fusion of the right ankle. (Id.) Physician Assistant King, with the approval of defendant Keyser, prescribed the following: (1) bottom bunk for one year; (2) extra mattress and pillow for one year; (3) Elavil 25 mg; (4) an updated PULHEAT/restriction form; (5) an orthotic

---

[2] Nurse Morgan noted that plaintiff was not taking his Darvocet-N because he did not want to take a controlled substance. (Id.)

[3] Following his transfer to HCI, plaintiff no longer was treated by defendant Turpin. (Id. Turpin Aff. ¶ 44.)

consult for custom made orthotics; (6) a suggestion that inmate Warren be moved closer to the mess hall to decrease his walking; and (7) an x-ray of both hips. (Id.) On January 26, 2006, plaintiff's Naprosyn was renewed. (Id. Keyser Aff. ¶ 10 and Ex. B.) The results of plaintiff's hip x-ray indicated no focal bony lesions of either the pelvis or the right or left hip. (Id. Keyser Aff. ¶ 11 and Ex. C.)

On February 15, 2006, plaintiff was seen by Physician Assistant King following plaintiff's evaluation for custom made orthotics by Hanger Orthotics. (Id. Keyser Aff. ¶ 12 and Ex. D.) Hanger Orthotics made the following alternative recommendations: (1) order a pair of special boots through Hanger Orthotics that would last longer and fit better; or (2) order "Dr. 2 shoes" which were cheaper, but not as long lasting. (Id.) On February 16, 2006, Physician Assistant King submitted a Utilization Review Board ("hereinafter "URB") request for either the special boots or Dr. 2 shoes, and the URB authorized the purchase of Dr. 2 shoes. (Id.)

On March 23, 2006, defendant Keyser authorized an increase in plaintiff's Percogesic prescription. (Id. Keyser Aff. ¶ 14 and Ex. E.) Plaintiff's Dr. 2 shoes were received at HCI on April 19, 2006. (Id. Keyser Aff. ¶ 15 and Ex. E.) Defendant Keyser approved a consultation/referral form to Hanger Prosthetics for rocker bottom shoe placement on plaintiff's Dr. 2 shoes to increase plaintiff's ease of movement. (Id.) Plaintiff received his rocker bottom Dr. 2 shoes on June 10, 2006. (Id.)

On June 15, 2006, defendant Keyser saw plaintiff in the medical clinic and noted that plaintiff's orthotic brace was rubbing plaintiff's calf. (Id. Keyser Aff. ¶ 20 and Ex. H.) Defendant Keyser noted that plaintiff needed repair and adjustment of his brace. (Id) Defendant Keyser

instructed plaintiff that he should use a clean, dry washcloth to pad his brace until he received his adjustment.[4] (Id.)

Plaintiff complained of hip pain on June 19, 2006. (Id. Keyser Aff. ¶ 21 and Ex. I.) Plaintiff was seen in the medical clinic by Nurse J. Smith. (Id.) Plaintiff stated that the rocker bottoms on his shoes helped. (Id.) Defendant Keyser approved a diet plan for plaintiff. (Id.) Plaintiff again was seen for hip pain on July 6, 2006. (Id. Keyser Aff. ¶22 Ex. I.) Physician Assistant King noted that prior x-ray results demonstrated no pathology. (Id.) Physician Assistant King also noted that plaintiff walked with an uneven gait with pain/radiculopathy down the S1 nerve root region, decreased strength with dorsal/planter flexion with the right foot, and a negative Babinski-Clonus reflex. (Id.) Physician Assistant King diagnosed plaintiff with degenerative joint disease and ordered an x-ray of plaintiff's lumbar spine. (Id.) Physician Assistant King also adjusted plaintiff's pain medication. (Id.) Defendant Keyser approved Physician Assistant King's recommendations. (Id.) Plaintiff's orthotic brace was adjusted by Hanger Orthotics on July 18, 2006. (Id. Keyser Aff. ¶ 20 and Ex. H.)

On July 27, 2006, defendant Keyser reviewed the results of plaintiff's lumbar spine x-ray. (Id. Keyser Aff. ¶ 24 and Ex. J.) The results indicated a partial compression fracture of L3 and endplate osteophytes (bone spurs), including osteophytes projecting into the spinal canal at L2. (Id.) Defendant Keyser approved the following course of action for plaintiff: (1) submit a URB request for a neurosurgery consultation; (2) increase Ibuprofen; and (3) submit a URB request for Neurontin. (Id. Keyser Aff. ¶ 25 and Ex. K.) The URB denied the request for a neurosurgery consultation, requesting that plaintiff first be evaluated by Physician Assistant King's supervising physician. (Id.)

---

[4] Defendant Keyser noted that the position of the orthotic device likely caused plaintiff to develop a cyst which defendant Keyser treated and removed. (Id. Keyser Aff. ¶¶ 16-20 and Exs. F, G, and H.)

Plaintiff also had an adjustment for his right ankle and foot orthotic at Hanger Orthotics during this time period. (Id. Keyser Aff. ¶ 23 and Ex. I.)

On September 21, 2006, defendant Keyser examined plaintiff and diagnosed him with a compression fracture at L3 and neuropathic pain of the left lower extremities. (Id. Keyser Aff. ¶ 27 and Ex. L.) Defendant Keyser initiated the following actions: (1) urged plaintiff to lose weight; (2) submitted a URB request for an increase of his Neurontin prescription; (3) continued plaintiff's Ibuprofen prescription; (4) prescribed Colace (a stool softener); and (5) submitted a URB request for a neurosurgical consultation. (Id.)

On October 26, 2006, defendant Keyser responded to the questions from the URB regarding his request for a neurosurgery consultation on behalf of plaintiff. (Id. Keyser Aff. ¶ 29 and Ex. N.) Defendant Keyser also submitted a URB request for a repair of plaintiff's Dr. 2 shoes. (Id.) Defendant Keyser then examined plaintiff on November 13, 2006 and December 7, 2006. (Id. Keyser Aff. ¶¶ 31 and 33 and Ex. O.) During this time period, the URB posed various questions to defendant Keyser regarding plaintiff's treatment, and ultimately approved the request to repair plaintiff's shoes on January 12, 2007. (Id.) Plaintiff's Dr. 2 shoes were repaired on March 27, 2007. (Id. Keyser Aff. ¶ 37 and Ex. P.)

On December 8, 2006, in accordance with URB instruction, defendant Keyser contacted Dr. Kenneth Price of Regional Neurosurgery. (Id. Keyser Aff. ¶ 34 and Ex. O.) Dr. Price recommended that plaintiff undergo an MRI of the lumbar spine prior to Dr. Price's evaluation of plaintiff. (Id.) Plaintiff had an MRI on January 19, 2007. (Id. Keyser Aff. ¶ 38 and Ex. Q.) The results of plaintiff's MRI revealed no evidence of a subarachnoid cyst, posterior lumbar disc herniation, nerve root sleeve compromise, or stenosis of the spinal cord. (Id.) The MRI did reveal slight anterior

12

wedging of the L3 vertebral body which could be the result of an old mild compression fracture or normal variation in vertebral body contour. (Id.) There also was some mild posterior central bulging of disc material at the L2-3 level which represented early degenerative change. (Id.) Based upon the foregoing results, the URB denied Defendant Keyser's URB request on behalf of plaintiff for a neurosurgery consultation because the URB guidelines had not been met. (Id.)

Following plaintiff's MRI, he was seen in the medical clinic on March 12, 2007. (Id. Keyser Aff. ¶ 40 and Ex. S.) Plaintiff's medications were altered and his prescription for a bottom bunk was renewed. (Id.) Plaintiff also received an extra pillow. (Id.)

Plaintiff again was examined in the medical clinic on May 3, 2007 and May 14, 2007. (Id. Keyser Aff. ¶¶ 43 and 45 and Exs. U and V.) Defendant Keyser noted that, based upon plaintiff's MRI and complaints, plaintiff had arthritis, but not nerve impingement. (Id.) Plaintiff was instructed at this appointment that he did not meet the North Carolina Department of Correction guidelines for an extra mattress or donut cushion. (Id.) Defendant Keyser also discussed with plaintiff the fact that he may benefit from an anti-inflammatory drug and weight loss. (Id.) Defendant Keyser also altered plaintiff's medications. (Id.)

On July 31, 2007, Family Nurse Practitioner Ikeakanam saw plaintiff in the medical clinic following a sick call request. (Id. Keyser Aff. ¶ 48 and Ex. W.) Plaintiff's medications were altered once again following his appointment. (Id.) On August 21, 2007, plaintiff's bottom bunk and extra pillow prescriptions were renewed. (Id. Keyser Aff. ¶ 49 and Ex. X.) On September 6, 2007, plaintiff received new Dr. 2 shoes with rocker bottoms. (Id. Keyser Aff. ¶ 50 and Ex. X.)

DISCUSSION

I.      Motion for Summary Judgment

A.    Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. <u>Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. <u>Anderson</u>, 477 U.S. at 250.

B.    Analysis

Defendants Turpin, Keyser, and Worley assert the defense of qualified immunity. Qualified immunity shields government officials performing discretionary functions from personal liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which [a] reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>DiMeglio v. Haines</u>, 45 F.3d 790, 794 (4th Cir. 1995). This immunity "protects law enforcement officials from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.' " <u>Wilson v. Layne</u>, 141 F.3d 111, 114 (4th Cir. 1998) (quoting <u>Maciariello v. Sumner</u>, 973 F.2d 295, 298 (4th Cir. 1992)). Immunity applies to "all but the plainly incompetent or those who knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986). Government officials performing a discretionary function are immune from civil damages unless: (i) the official's conduct violates a federal statutory or constitutional right; (ii) the right was clearly

14

established at the time of the conduct; and (iii) an objectively reasonable officer would have understood that the conduct violated that right. <u>Milstead v. Kibler</u>, 243 F.3d 157, 161 (4th Cir. 1991) (citing <u>Wilson v. Layne</u>, 526 U.S. 603, 614-15 (1999)).

Because defendants asserted the defense of qualified immunity, the court first must determine whether each defendant is entitled to qualified immunity. In analyzing qualified immunity, the first step is to determine whether defendants Turpin, Keyser, or Worley violated a federal statutory or constitutional right.

1.      Plaintiff's Claims Against Defendant Turpin

Plaintiff alleges that defendant Turpin violated his Eighth Amendment rights because defendant Turpin was deliberately indifferent to his medical needs. "In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.' " <u>Strickler v. Waters</u>, 989 F.2d 1375, 1379 (4th Cir. 1993) (quoting <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991)). The Supreme Court has explained that the first prong is an objective one–the prisoner must show that "the deprivation of [a] basic human need was objectively 'sufficiently serious' "–and the second prong is subjective–the prisoner must show that "subjectively 'the officials act[ed] with a sufficiently culpable state of mind.' " <u>See Strickler</u>, 989 F.2d at 1379 (quotations omitted).

Assuming without deciding that plaintiff is able to satisfy the objective prong of the Eighth Amendment test, his claim still fails because he is not able to establish the second prong–that defendant Turpin acted with deliberate indifference. "Deliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the

15

very purpose of causing harm or with knowledge that harm will result." See Farmer v. Brennan, 511 U.S. 825, 835 (1994). It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. Id. at 837; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995). A disagreement between an inmate and a physician regarding the appropriate form of treatment does not state a claim for deliberate indifference. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Likewise, mere negligence or malpractice in diagnosis or treatment does not state a constitutional claim. Estelle v. Gamble, 429 U.S. 97, 105-106 (1976); Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998); Sosebee v. Murphy, 797 F.2d 179, 181-82 (4th Cir. 1986); Wester v. Jones, 554 F.2d 1285, 1286 (4th Cir. 1977).

Plaintiff's deliberate indifference claim against defendant Turpin is based on his allegation that defendant Turpin ignored his chronic lower back pain, his hip pain, his leg pain, his degenerative right hip, and his fractured lumbar. Plaintiff also alleges that defendant Turpin acted with deliberate indifference because he refused plaintiff's requests for an MRI. Plaintiff's medical records, however, do not support plaintiff's assertions. Rather, the records indicate that defendant Turpin and the medical staff at CCC saw plaintiff on a regular basis from June 10, 2003 through December 8, 2005. Most of plaintiff's appointments with defendant Turpin were in connection with plaintiff's complaints of hip pain. Plaintiff's medical records indicate that defendant Turpin ordered two x-rays of plaintiff's left hip, three x-rays of plaintiff's lumbar spine, and three x-rays of plaintiff's right hip. Defendant Turpin diagnosed plaintiff with arthritis and an old mild compression of the L3, and instructed plaintiff that surgical intervention was not necessary. (Id. Turpin Aff. ¶ 13 and Ex. C.) Defendant Turpin also ran several diagnostic laboratory tests to

16

determine whether there was alternative etiology of plaintiff's pain complaints. Finally, defendant Turpin prescribed several combinations of drugs to control plaintiff's pain.

The above-stated facts do not support the conclusion that defendant Turpin knowingly disregarded plaintiff's serious medical needs, and plaintiff has not presented any evidence to the contrary. Instead, these facts demonstrate that plaintiff disagreed with defendant Turpin's treatment of his hip and leg pain. However, as stated, a disagreement between an inmate and a physician regarding the appropriate form of treatment does not state a claim for deliberate indifference. Wright, 766 F.2d at 849. Therefore, plaintiff has not established that defendant Turpin's treatment of his hip and leg pain violated his Eighth Amendment rights, and plaintiff is unable to establish the subjective prong of the Strickler test. Because plaintiff is unable to establish the subjective prong of the Strickler test, he is unable to establish an Eighth Amendment claim. Accordingly, defendant Turpin is entitled to qualified immunity.

### 2. Plaintiff's Claim against Defendant Keyser

Plaintiff alleges that defendant Keyser was deliberately indifferent to his serious medical condition. As stated, "[i]n order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.' " Strickler, 989 F.2d at 1379.

Plaintiff states that defendant Keyser was deliberately indifferent to his serious medical needs because defendant Keyser failed to treat his hip pain, failed to treat his fractured lumbar, failed to treat his leg swelling/discoloration, and failed to refer him to a neurosurgeon. The court will begin with the subjective component of the Strickler test. Plaintiff's medical records show that

defendant Keyser treated plaintiff at HCI from December 8, 2005 through the filing of this action. The Medical records also show that both defendant Keyser and HCI staff saw and treated plaintiff on multiple occasions for his hip and leg pain. Defendant Keyser ordered several x-rays of plaintiff's hips and lumbar spine. Defendant Keyser also prescribed several different alternative drug therapies, an extra mattress, an extra pillow, and custom orthotics.[5] Finally, defendant Keyser treated plaintiff for a cyst and swelling of his leg.

As for the Neurosurgical consultation, defendant Keyser submitted a URB request for a neurosurgical consultation. Following his request, the URB asked that defendant Keyser contact Dr. Price at Regional Neurosurgery. Dr. Price recommended a MRI for plaintiff. Upon receiving the results of the MRI, defendant Keyser determined that plaintiff had arthritis and not a nerve impingement. The URB then determined that a neurosurgical consultation was not necessary because plaintiff did not meet the URB guidelines for the procedure.

Based upon the foregoing facts revealed in plaintiff's medical records, the record reflects that defendant Keyser was responsive to plaintiff's complaints of hip and leg pain. Accordingly, the aforementioned facts do not support the conclusion that defendant Keyser acted with deliberate indifference. Plaintiff has not presented any evidence to the contrary. Rather, as with defendant Turpin, the facts in this case demonstrate that plaintiff disagreed with the treatment he received. As stated, a disagreement between an inmate and a physician regarding the appropriate form of treatment does not state a claim for deliberate indifference. Wright, 766 F.2d at 849. Therefore, plaintiff has not established the subjective element of his Eighth Amendment deliberate indifference claim. Because plaintiff has not demonstrated the subjective element of his Eighth Amendment

---

[5] Defendant Keyser also ordered alterations and adjustments to plaintiff's orthotics.

claim, he has not established a constitutional violation and defendant Keyser is entitled to qualified immunity.

3.    Plaintiff's Claim Against Defendant Worley

Plaintiff alleges that defendant Worley failed to provide him with medical care for his right hip and fractured back.  Plaintiff also alleges that defendant Worley refused to provide him with an MRI.  As stated, "[i]n order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.' " Strickler, 989 F.2d at 1379.

The evidence in the record demonstrates that defendant Worley is a nurse at CCC.  The record also demonstrates that defendant Worley saw plaintiff on June 30, 2003.  Defendant Worley noted during her examination of plaintiff that he had good movement in his hips.  Defendant Worley recommended a lumbar spine x-ray and that plaintiff receive an extra pillow for proper alignment of his hips and spine.  Defendant Worley also recommended that plaintiff exercise his abdominal muscles.  Defendant Turpin reviewed plaintiff's medical records and agreed with defendant Worley's recommendations.  Plaintiff's x-ray was completed.  Defendant Turpin and the medical staff at CCC then continued to treat plaintiff's hip and leg pain.

The above-stated allegations demonstrate that defendant Worley provided plaintiff treatment in a timely fashion and that there is no evidence that plaintiff was denied treatment for his hip and leg pain.  On the contrary, plaintiff's medical records show a constant and regular course of treatment for plaintiff's ailments.  Plaintiff does complain that defendant Worley refused to facilitate an MRI.  With this allegation it is apparent that plaintiff's complaint is not with the availability of

19

treatment, but with the prescribed treatment of defendant Worley and defendant Turpin. This is not

sufficient to state an Eighth Amendment deliberate indifference claim. See Russell v. Sheffer, 528

F.2d 318, 319 (4th Cir.1975) (per curiam) (holding that a prisoner is not entitled to choose his course

of treatment). Because plaintiff has not demonstrated that defendant Worley's treatment of his hip

and leg pain violated his constitutional rights, she is entitled to qualified immunity for this claim.


II.     Motion to Dismiss

        A.     Standard of Review

        Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a suit to be dismissed for failure

to state a claim upon which relief can be granted. A Rule 12(b)(6) motion to dismiss only

determines whether a claim is stated; it does not resolve disputed facts, the merits of the claim, or

applicability of defenses. Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A

Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure, § 1356 (1990)). A court

should not dismiss a complaint that states a claim, even if it appears that the chance of recovery is

remote. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v.

Fitzgerald, 457 U.S. 800 (1982). For the purposes of ruling on a Rule 12(b)(6) motion to dismiss,

the court should construe allegations in the complaint as true and taken in the light most favorable

to the plaintiff. Jenkins v. McKeithen, 395 U.S. 411, 421 (1969); Republican Party, 980 F.2d at 952.

        B.     Analysis

               1.     Exhaustion of Administrative Remedies

        Defendant Harrison contends that plaintiff's claim against her should be dismissed because

plaintiff failed to exhaust his administrative remedies for his claims against her prior to filing suit.

20

The Prison Litigation Reform Act (hereinafter "PLRA") requires a prisoner to exhaust his administrative remedies before filing an action under § 1983 concerning his confinement. See 42 U.S.C. § 1997e(a). In Booth v. Churner, 532 U.S. 731, 741 (2001), the Supreme Court held that the PLRA requires a prisoner to exhaust his administrative remedies even if the relief requested is not available under the administrative process. The Supreme Court explained the rationale underlying § 1997e(a) in Porter v. Nussle, 534 U.S. 516, 524-525 (2002), stating:

> Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. Booth, 532 U.S. at 737. In other instances, the internal review might "filter out some frivolous claims." Ibid. And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy. See ibid.; see also [McCarthy v.] Madigan, 503 U.S. [140, 146 (1992).]

Defendant Harrison admits that plaintiff exhausted his administrative remedies regarding the care he received for his hip and leg pain at HCI, but contends that he did not exhaust against her because he did not specifically name her in any grievance. As previously stated, the United States Supreme Court in Jones, recently issued an order regarding exhaustion of administrative remedies. Jones v. Bock, 549 U.S. 199, 127 S.Ct. 910 (2007). In this order, the Court found that the PLRA does not require that a plaintiff name an individual in his grievance in order to exhaust his administrative remedies against that individual. Id. at 922; see Moore v. Bennette, 517 F.3d 717, 726 (4th Cir. 2008) (stating that the administrative remedy procedure requires "only that a grievance be submitted on a Form DC-410, which does not require identification of the persons responsible for the

challenged conduct.")  Although plaintiff does not specifically name defendant Harrison in his exhausted grievances, it is clear that he is complaining about the medical care he received from the medical staff at HCI.  Accordingly, this court finds that plaintiff properly exhausted his claim against defendant Harrison.  Therefore, defendant Harrison's motion to dismiss on this ground is DENIED.

2.  North Carolina Medical Malpractice Claim

Defendant Harrison also alleges that plaintiff failed to state a claim upon which relief may be granted for his North Carolina state law claim for medical malpractice.  North Carolina imposes substantive legal requirements that a person must follow to pursue a medical malpractice claim.  See N.C. R. Civ. P. 9(j).  Under North Carolina Rule of Civil Procedure 9(j), a plaintiff's medical malpractice complaint must assert that the medical care has been reviewed by a person who is reasonably expected to qualify (or whom the plaintiff will move to qualify) as an expert witness and who is willing to testify that the medical care received by the plaintiff did not comply with the applicable standard of care.  See N.C. R. Civ. P. 9(j)(1), (2); see, e.g., Frazier v. Angel Med. Ctr., 308 F. Supp. 2d 671, 676 (W.D.N.C. 2004); Acosta v. Byrum, 180 N.C. App. 562, 572, 638 S.E.2d 246, 253 (2006).  Alternatively, the complaint must allege facts establishing negligence under the common-law doctrine of res ipsa loquitur.  See N.C. R. Civ. P. 9(j)(3).  Failure to comply with Rule 9(j) is grounds for dismissal of a state medical malpractice claim brought in federal court.  See, e.g., Estate of Williams-Moore v. Alliance One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 649 (M.D.N.C. 2004); Frazier, 308 F. Supp. 2d at 676–77; Moore, 139 F. Supp. 2d at 713.

Plaintiff's complaint fails to allege that he obtained certification from an expert willing to testify that his treating medical personnel did not comply with the applicable standard of care.  Further, the doctrine of res ipsa loquitur "is allowed only when the occurrence clearly speaks for

22

itself." Diehl v. Koffer, 140 N.C. App. 375, 378, 536 S.E.2d 359, 362 (2000); see, e.g., Tice v. Hall, 310 N.C. 589, 593, 313 S.E.2d 565, 567 (1984) (surgical sponge left in patient's body); Hyder v. Weilbaecher, 54 N.C. App. 287, 292, 283 S.E.2d 426, 429 (1981) (stainless steel wire left in patient). Plaintiff has not alleged facts which would establish negligence under the doctrine of res ipsa loquitur. Thus, plaintiff fails to meet the requirements of Rule 9(j). Therefore, his North Carolina medical malpractice claim is DISMISSED without prejudice.

## CONCLUSION

For the foregoing reasons, the motion to dismiss of (DE # 14) of defendant Harrison is DENIED with regard to the exhaustion issue. However, defendant Harrison's motion is GRANTED with regard to plaintiff's North Carolina state law claim for medical malpractice. Plaintiff's medical malpractice claim is DISMISSED without prejudice. The motion for summary judgment (DE # 35) of defendant Worley, and the motion for summary judgment (DE # 34) of defendants Turpin and Keyser are GRANTED.

SO ORDERED, this the 29th day of September, 2008.


    /s/ Louise W. Flanagan
LOUISE W. FLANAGAN
Chief United States District Judge